ZDANIS LAW FIRM, PLLC
By: Karen L. Zdanis, Esq. (KZ3651)
55 Old Turnpike Road, Suite 304
Nanuet, New York 10954
Tel (845) 356-0855

STEGER KRANE LLP
By: Michael D. Steger, Esq. (MS2009)
30 Ramland Road, Suite 201
Orangeburg, NY 10962
(845) 359-4600

*Attorneys for Plaintiff*

**13 CV 3497**

JUDGE SEIBEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RONALD LEWIS,

                              Plaintiff,

              -against-

FIRST NATIONAL BANK OF JEFFERSONVILLE
a/k/a JEFF BANK and VIRGINIA SANBORN,
individually and in their official capacities and
as aiders and abettors,

                              Defendants.

-------------------------------------------------------------------X

**COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

        Plaintiff RONALD LEWIS ("Plaintiff"), by his attorneys, ZDANIS LAW FIRM, PLLC

and STEGER KRANE LLP, complaining of Defendants herein, alleges, upon knowledge as to

himself and his own actions, and upon information and belief as to all other matters:


## JURISDICTION AND VENUE

1.      This is a civil action based upon Defendants' violations of the Age Discrimination in

Employment Act, 29 U.S.C. Sec. 621, *et seq.*;  Family Medical Leave Act of 1993, 29

U.S.C. §§ 2601, *et seq.*, New York Executive Law, § 292 <u>et seq.</u> New York State Human Rights Law, New York common law; and any other common law or statutory cause of action which can be inferred from the facts set forth herein.

2.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1343 and 28 U.S.C. § 1343(4).  The supplemental jurisdiction of the Court (28 U.S.C. § 1367) is invoked over state and local law causes of action.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events giving rise to Plaintiff's causes of action took place in this judicial district.

4.      The jurisdictional prerequisites to this lawsuit have been completed.  Plaintiff filed a formal administrative complaint with the New York State Division of Human Rights and dually filed this complaint with the Equal Employment Opportunity Commission ("EEOC") on or about September 28, 2012 and was issued a Right to Sue letter dated April 19, 2013 from the EEOC.  A copy of the Right to Sue letter is attached hereto as Exhibit A.

## **PARTIES**

5.      At all relevant times Plaintiff Ronald Lewis was and is a resident of Sullivan County, New York.

6.    Defendant First National Bank of Jeffersonville ("Jeff Bank") is a bank chartered in the State of New York with its principal place of business at 4866 State Route 52, Jeffersonville, NY 12748.

7.    Virginia Sanborn ("Sanborn"), at all relevant times, was a supervisor for Jeff Bank. As such, Sanborn was charged with the responsibility of ensuring that employees are not subjected to discriminatory and/or retaliatory practices. As a supervisor for Jeff Bank, Sanborn was and is charged with many or all aspects of Jeff Bank's operation, including, but not limited to, the hiring, firing, promotion, and discipline of employees and all other employment-related issues. Sanborn also had the power to make employment decisions regarding Plaintiff's employment.

8.    Jeff Bank and Sanborn are collectively referred to herein as "Defendants".

## FACTS

**Plaintiff's Employment History**

9.    Plaintiff was born on December 22, 1950.

10.    Plaintiff commenced his employment with Jeff Bank as an Accounting Supervisor in March of 2002 at Jeff Bank and reported directly to Jeff Bank's then-Chief Financial Officer, Charles Burnett. At the time Jeff Bank hired him, Plaintiff had more than 27 years of combined work experience and had been employed in the banking industry, and the insurance industry. Plaintiff also had experience in project management and information technology.

3

11.   Plaintiff had no training or experience in tax accounting.

12.   As Accounting Supervisor, Plaintiff was responsible for supervising three accounting clerks, monitoring Jeff Bank's compliance with Sarbanes-Oxley, and preparing and reviewing Jeff Bank's non-tax Federal Reserve Bank Reports and Jeff Bank's non-tax Quarterly Call Reports to the Office of the Comptroller of the Currency.

13.   Throughout the course of Plaintiff's employment with Jeff Bank, Plaintiff's work performance has been satisfactory or better.

14.   Plaintiff went above and beyond his duties in keeping informed of changes to the regulatory reporting process and in taking the initiative to recommend and implement projects that benefited Jeffersonville.

15.   Plaintiff held the position of Accounting Supervisor up to and until his termination. Plaintiff was more than qualified for this position, as is demonstrated not only by the absence of noteworthy accounting errors during Plaintiff's tenure and by virtue of the fact that Plaintiff was held in such high regard that he was asked to troubleshoot accounting errors across all of Jeff Bank's corporate departments.

16.   Plaintiff's last two annual performance evaluations at Jeff Bank, for the periods ending February of 2010 and March of 2011 were positive and assessed Plaintiff as consistently meeting or exceeding expectations. Each evaluation noted: "...Ron [Plaintiff] is a very

4

consistent performer, performing tasks consistently from period to period," and "You consistently perform all duties with a better than average level of accuracy from quarter to quarter." Thus, Plaintiff was more than qualified for the position he held when he was abruptly terminated.

17.    On April 19, 2012, Plaintiff was the most senior employee at Jeff Bank's Finance Division in terms of age and longevity with Jeff Bank .

18.    In or about 2005 Defendant Sanborn, a Certified Public Accountant, was hired as Jeff Bank's Controller despite the fact that Sanborn had no banking experience. Plaintiff made all efforts to welcome Sanborn and to educate Sanborn on Jeff Bank's processes and procedures.

19.    Despite Plaintiff's efforts, Sanborn began discriminating against Plaintiff after she hired Jason White ("White"), a 20-something year-old employee who was less qualified than Plaintiff for the job responsibilities of an Accounting Supervisor because he lacked the experience.

**Discrimination and Retaliation**

20.    In 2010, Sanborn unjustifiably attempted to have White take over some of Plaintiff's supervisory responsibilities, explaining that White was a "young rising star." Sanborn's actions were not attributed to a legitimate business reason, as Plaintiff was performing his job well. Nevertheless, because Plaintiff was a cooperative employee, Plaintiff did not

challenge Sanborn's request and assisted in the transition of some of Plaintiff's supervisory responsibilities to White.

21.   No similarly-situated co-workers outside Plaintiff's protected classes were asked to relinquish some of their job responsibilities so that another employee could advance within Jeff Bank.

22.   Sanborn misled Plaintiff into believing that Plaintiff would be promoted along with White in a new organizational structure Jeff Bank was going to announce if Plaintiff taught White some of Plaintiff's job responsibilities, for example, the Quarterly Call Report.

23.   Sanborn repeatedly referred to White as a "young rising star" when she took discriminatory actions against Plaintiff in favor of White.

24.   In 2011, Plaintiff learned that Sanborn was rewarding White with additional bonuses and merit increases at Plaintiff's expense.

25.   In early 2011, Sanborn proposed that Plaintiff's responsibilities and Department be split in two so that White could manage one half of them. Plaintiff objected to Sanborn's proposal because it was a discriminatory and baseless encroachment on Plaintiff's job. At the time of Sanborn's proposal, Plaintiff had no performance problems and Plaintiff's employment record reflected that of a competent Accounting Supervisor.

26.   In March of 2011, after Plaintiff learned of Sanborn's proposal to transfer half of Plaintiff's job responsibilities to White, Plaintiff reported Sanborn's discrimination to Claire Taggart ("Taggart") who worked in Jeff Bank's Human Resources Department.

27.   After Plaintiff complained to Taggart about Sanborn's attempt to transfer half of Plaintiff's job responsibilities to White, Jeff Bank overruled Sanborn and left Plaintiff's responsibilities intact

28.   Unfortunately, although Plaintiff was able to stop Sanborn from discriminating against Plaintiff in March of 2011, Sanborn continued her discrimination against Plaintiff in favor of White.

29.   To further discriminate and retaliate against Plaintiff, Sanborn made several negative false comments in Plaintiff's 2010-2011 evaluation. For example, Sanborn inaccurately stated that Plaintiff was untimely in preparing his staff's evaluations. In actuality, the evaluation was delayed because the Human Resources Department and Sanborn herself delayed approving it.

30.   In late 2011 Sanborn displayed outward hostility toward Plaintiff by making abusive and belittling Plaintiff within earshot of Plaintiff's staff and other co-workers. No similarly-situated co-workers outside Plaintiff's protected classes were ever instructed on how to direct his/her staff members immediately within an earshot of them or were subjected to Sanborn's displays of outward hostility.

7

31.    Despite the fact that Plaintiff had been effectively managing Plaintiff's staff for nearly ten years, in late 2011 Sanborn began scolding Plaintiff and on several occasions made unreasonable demands within earshot of Plaintiff's staff regarding instructions to Plaintiff's staff. Sanborn's purpose was to humiliate Plaintiff and undercut his authority, as was evidenced by Sanborn's demand that Plaintiff immediately walk ten feet away from where Sanborn had scolded Plaintiff to repeat Sanborn's instructions to his staff verbatim, despite the fact that there was no urgency to the directives. For example, Sanborn instructed Plaintiff to immediately repeat her instruction on how the clerks should make comments on outstanding items on reconciliation reports weeks before it was necessary. Sanborn's demand was not only humiliating, it was counterproductive because it created additional work because many of the outstanding items would clear as the reconciliation report date approached.

32.    Beginning in or about mid-November 2011, Sanborn began harassing Plaintiff by repeatedly making cutting ageist remarks.  For example, Sanborn repeatedly told Plaintiff "your memory is going," and "I can't tell you why, I know you have done this before, but I just don't trust you can do it."  No similarly-situated co-workers outside Plaintiff's protected classes were faced with the same or similar remarks.

33.    Upon information and belief, Sanborn was encouraged to continue harassing Plaintiff when Jeff Bank released Charles Burnett, then Jeff Bank's Chief Financial Officer, from Jeff Bank's employ when Mr. Burnett was approximately 61 years of age.  Immediately following Mr. Burnett's dismissal, Sanborn, who was then the highest ranking

Accounting employee, made further efforts to reassign some of Plaintiff's job responsibilities to White concerning the "coaching" of the staff.

34.   After Mr. Burnett's departure, Sanborn first directed Plaintiff to create desk procedures for preparing the Quarterly Call Report, one of Plaintiff's major responsibilities. The desk procedures provided White with the instruction required to prepare the Quarterly Call Report.

35.   Second, Sanborn provided and instructed other Jeff Bank employees to send some of the data necessary to prepare parts of the Quarterly Call Report to White instead of Plaintiff, thereby preventing Plaintiff from performing this job responsibility.

36.   On December 6, 2011, Sanborn handed Plaintiff a spurious PIP, which was used by Sanborn for no legitimate purpose, but rather to overwhelm and intimidate Plaintiff. The PIP consisted of more than three single-spaced pages of tasks Plaintiff was required to perform within varying time periods, all within a 90 day timeframe.

37.   Plaintiff never received a verbal or a written warning of any performance issue prior to receiving the PIP on December 6, 2011.

38.   The PIP was not a tool that Jeff Bank had commonly used in managing employees during Plaintiff's ten years with Jeff Bank. No similarly-situated co-workers outside Plaintiff's protected classes had ever received a written performance improvement plan requiring 90

9

day monitoring and immediate and sustained improvement with a threat of termination if any portion of the plan was violated at any time.

39.     The PIP was administered contrary to the ten year policy of Jeff Bank that Plaintiff was familiar with in which a supervisor was to give an employee a verbal warning approximately 30-60 days before administering a written warning. Subsequent to the verbal warning, Jeff Bank's policy was to have a supervisor provide a written statement to document the verbal warning. The written statement was to be signed by both the employee and supervisor.

40.     The spurious PIP, which was mired with inaccuracies and contradictions, combined with Sanborn's display of anger towards Plaintiff, agitated the already hostile work environment created by Sanborn.

41.     The PIP did not identify a *bona fida* performance issue. The PIP failed to make any reference to a specific performance issue, and alleged nothing but the vague statements that Plaintiff needed to demonstrate sustained improvement in the areas of "Productivity, supervision and other skill sets" and that Plaintiff was "not performing his assigned work in accordance with what is expected of an accounting supervisor."

42.     The PIP alleged the time period of Plaintiff's non-performance was November 10 to November 30. However, during this period Jeff Bank's administrative staff only worked

twelve days because of weekends and the holiday and Plaintiff was out of the office for approximately five of these twelve days.

43.     The PIP provided no meaningful training for Plaintiff. Although the PIP stated it provided for optional training by Sanborn at Plaintiff's request, and Sanborn claimed she had an open door policy to discuss any concerns in the PIP, Sanborn did not follow this policy. Early on, when the Plaintiff asked for training, the training provided was vague and largely inadequate. At all times after February 7, 2012, Sanborn failed and refused to provide training.

44.     The only specific suggestion as to guidance in the PIP was for Plaintiff to read the book Being Wrong – Adventures in the Margin of Error by Kathryn Shultz.  This book is not an accounting book. The PIP also referenced an unnamed time management course through Jeff Bank's EAP Program.  Neither of these suggestions offered sincere guidance because Plaintiff did not have an issue with time management and the accuracy of Plaintiff's reports was never identified as a performance issue.

45.     In this case, the PIP was not in conformance with the customary meaning and use of performance improvement plans as a management tool because it was not remedial in that it was not aimed at improving Plaintiff's then-existing responsibilities, but was merely being used as a part of Sanborn's scheme to find a pretextual reason to terminate Plaintiff because of his age.  Ironically, the PIP required Plaintiff to do additional work that Sanborn, as Controller, had performed for several years and/or was responsible for,

including corporate tax reporting work that had never been part of Plaintiff's job responsibilities and that Plaintiff had no experience with.

46.    Sanborn did not place White on a PIP, nor did Sanborn grade White on any of the tasks required in the PIP. Rather, Sanborn provided White a copy of one of the PIP tasks, the Tax Accrual Worksheet Task, and told White he could review it as an academic tool. Sanborn disparately treated Plaintiff in administering the PIP.

47.    The assignments mandated by the PIP were to be performed by Plaintiff in addition to Plaintiff' regular job duties and year-end closing responsibilities, and therefore Plaintiff was forced to work 60-80 hour weeks and weekends at home to accomplish the assignments.

48.    The additional work assigned to Plaintiff in the PIP included a substantial amount of corporate tax reporting that was not for a legitimate business purpose, because a recent change in Jeff Bank's external tax consultants' structure eliminated the former requirement that Jeff Bank's corporate tax return/reports be reviewed by an employee of Jeff Bank.

49.    On December 7, 2011, Plaintiff reported to Taggart his belief that the PIP was another instance of Sanborn's age discrimination because it was unjustified and created an excessive amount of work, a substantial amount of which had never been part of Plaintiff's job duties and was new to Plaintiff.

50.   Upon reporting the discrimination, Taggart offered no guidance or assistance. Taggart also failed to perform an investigation, and instead brushed Plaintiff off and trivialized Plaintiff's complaint, telling Plaintiff that he should look at the PIP as a "challenge."

51.   Plaintiff completed and submitted all of the exercises required by this date and was current on all of the requirements set forth in the PIP by February 7, 2012, which was the end of the 60 day window for the PIP..

52.   Following the February 7 (60 day) meeting, Defendants changed direction and refused to provide Plaintiff with any of the training needed for the PIP and ignored Plaintiff's repeated requests for assistance. After February 7, Sanborn told Plaintiff that she was busy and did not have time to address Plaintiff's questions and tersely told Plaintiff to "figure it out" himself.

53.   On or before February 24, 2012, Plaintiff completed all of the tasks required in the PIP and submitted them to Sanborn. Yet, Sanborn and Jeff Bank failed to review any of the PIP exercises Plaintiff submitted, and Plaintiff never received any detailed criticism or review of them from Sanborn or Jeff Bank.

54.   On February 24, 2012, Plaintiff submitted a written complaint of age discrimination and a hostile work environment to Taggart.

55.    Jeff Bank did not perform a good faith investigation into Plaintiff's discrimination complaint and failed to have anyone with sufficient knowledge of accounting examine Plaintiff's complaint concerning the PIP.

56.    In or about February of 2012, Plaintiff was diagnosed with the disabilities of anxiety and depression after seeking treatment because of the mental distress and anxiety caused by the hostile work environment created by the above-mentioned actions of Defendants.

57.    On or about February 27, 2012, Plaintiff requested a medical leave and provided Defendants with a doctor's note that informed Jeff Bank and Sanborn that Plaintiff had been diagnosed with anxiety and depression and was potentially suicidal.

58.    During Plaintiff's medical leave Sanborn transferred Plaintiff's job responsibility of preparing the Quarterly Call Report to White.

59.    During Plaintiff's medical leave White was promoted to an officer level position at Jeff Bank and given a raise.

60.    On or about April 10, 2012 Plaintiff returned to work from his medical leave. Upon Plaintiff' return to work, Sanborn continued to be hostile to Plaintiff. On April 11, 2012, Sanborn asked Plaintiff for a meeting to address the PIP. During the meeting Sanborn did not discuss anything productive or anything of substance. Instead, Sanborn was extremely belligerent and, instead of giving guidance or constructive criticism, used the

meeting as an opportunity to belittle Plaintiff for six hours alone in a conference room. The meeting only concluded because Plaintiff had to leave for a doctor's appointment for the medical conditions arising from Defendants' actions. For example, during the meeting Sanborn told Plaintiff in sum and substance: "as an accounting supervisor you should know how to do all this stuff" and "I know you know how to do this, I just don't have confidence in you." Plaintiff tried to defend himself, but Sanborn was not interested in a discussion, it appeared she was only interested in intimidating Plaintiff. During this meeting Sanborn raised her voice to Plaintiff and slammed her fist down on the conference room table, stating in sum and substance: "if I make a suggestion something should be done, I demand it be done" to intimidate Plaintiff.

61.   On April 11, 2012, during the inordinately long meeting, Sanborn again refused to provide Plaintiff with training on the tax issues that were new to him because she claimed to have no time, and instead Sanborn told Plaintiff to "take a stab at it yourself."

62.   During the April 11, 2012 meeting, Sanborn belittled Plaintiff by telling him she knew Plaintiff was "technical" but unfairly criticized him for not performing a task in the technical manner she would have preferred. Sanborn's criticism of Plaintiff for not being "technical" was a type of euphemism for the fact that Plaintiff was not young and that Sanborn perceived that Plaintiff was unable to understand computers or learn anything new because of his advanced age.

15

63.    After Plaintiff returned from his medical leave, in April of 2012, he noticed that Sanborn's approach to the PIP had changed. During the April 11 meeting, Sanborn began quizzing Plaintiff on items he never had training on and asked Plaintiff if he understood tax accounting theory. Sanborn did not explain the correct answer, even if Plaintiff needed an explanation. Therefore, although Sanborn was referring to her quizzing as a "teaching technique," Sanborn was not teaching Plaintiff anything. Sanborn was merely belittling Plaintiff's lack of knowledge on tax theory, which he never had any training or experience in. At this time it became clear to Plaintiff that even if he had performed the PIP tasks satisfactorily, Sanborn was not going to acknowledge Plaintiff's successful completion.

64.    During the April 11, 2012 meeting it became evident to Plaintiff that Sanborn either failed to provide Plaintiff with or maliciously deleted valid source documents important to some of the PIP tasks in an attempt to prevent Plaintiff from successfully completing the PIP.

65.    During the April 11 meeting, Plaintiff confronted Sanborn and informed her that the "Disclosure Statement" provided to Plaintiff in connection with the PIP's assignments was missing a computer worksheet that was an important source document. The fact that this source document was missing made completing the PIP task extremely time-consuming and difficult for someone without training in tax accounting. Sanborn did not deny that the computer worksheet was missing and never followed up on her promise to look into her records to check on what was provided to Plaintiff. Sanborn failed to

provide a valid source document to set Plaintiff up for failure on the PIP. Notwithstanding, Plaintiff successfully completed the worksheet by doing extra work.

66.  During the April 11, 2012 meeting it also became known to Plaintiff that Sanborn had provided him an invalid source document to prepare the 2011 Tax Accrual Spreadsheet. After Sanborn approved Plaintiff's completion of the 2010 Tax Accrual Spreadsheet, on or about December 14, 2011, Sanborn withheld necessary updates to this spreadsheet from Plaintiff. Plaintiff was unaware of any updates until April 11, 2012. During the meeting with Sanborn on April 11, Plaintiff learned that Sanborn had spoken with Jeff Bank's external accountants, who had informed Sanborn of some tax changes that necessitated changes to the Tax Accrual Spreadsheet. Sanborn never informed Plaintiff that she had spoken with the accountants or that she learned new information concerning calculations on the Tax Accrual Spreadsheet. Yet, Sanborn had previously informed Plaintiff that he would be responsible for this task going forward (as part of his regular job duties). Sanborn's failure to inform Plaintiff of information necessary to completion of his job duties is further evidence that Sanborn was withholding important information from Plaintiff to set him up for failure and that Sanborn had no intention of having Plaintiff would take over this task because she intended to terminate Plaintiff.

67.  On April 19th, 2012, without warning and barely a week after he returned from his stress-induced medical leave, Defendants abruptly terminated Plaintiff in a meeting that lasted approximately five minutes. John Russell ("Russell"), Sanborn and Taggart were present in this meeting, and they told Plaintiff they were terminating him because Russell felt

Plaintiff did not meet the requirements of the PIP and believed Plaintiff would not be able to do so in the future. Defendants did not provide any further specifics to Plaintiff in this meeting.

68.  As of April 19, 2012, Jeff Bank had never terminated any similarly-situated co-workers outside Plaintiff's protected classes for not meeting the requirements of a 90 day PIP.

69.  Russell had virtually no interaction with Plaintiff regarding Plaintiff's performance under the PIP. Outside of one meeting Russell attended with Sanborn and Taggart, Russell had no direct interaction with Plaintiff during the 90 day PIP period.  Jeff Bank told Plaintiff that Russell sat in two meetings with the Human Resources Department merely to protect the bank from litigation.

70.  In terminating Plaintiff, Jeff Bank relied upon the information provided by Sanborn with regard to Plaintiff's performance of the tasks set forth in the PIP.

71.  Jeff Bank's termination of Plaintiff was discriminatory on the basis of Plaintiff's age. The circumstances surrounding the termination, as set forth above, give rise to an inference of discrimination. Plaintiff's discharge, which was nine days after he returned from medical leave, was the product of Sanborn's scheme to discriminate against and harass Plaintiff on account of his age.  By design, Sanborn's PIP ultimately became Jeff Bank's pretextual reason to fire Plaintiff so that it could replace Plaintiff with a substantially younger employee -- White.

72.   When Plaintiff later asked John Russell why Jeff Bank terminated him after Plaintiff's ten years of good performance and dedicated service, and that Sanborn had fabricated this PIP with a discriminatory motive, Russell brushed Plaintiff off and mimicked Sanborn's explanation.

73.   During the meeting in which Defendants fired Plaintiff, Taggart informed Plaintiff that his deficiencies under the PIP would be documented and mailed to Plaintiff, however, Defendants never provided the promised documentation.

74.   Defendants' hostile work environment and the discriminatory actions they took leading up to and including Plaintiff's termination have emotionally and financially harmed Plaintiff.

75.   After Defendants terminated Plaintiff, Jeff Bank, by Sanborn and/or Russell, transferred the majority of Plaintiff's job responsibilities to White, including signing-off on daily and monthly reconciliations and reports, and providing supervisory support a/k/a "coaching support" for the accounting staff.

76.   Subsequently, after White resigned, Jeff Bank, by Sanborn and/or Russell, hired or promoted Renee Rohr, a substantially-younger employee than Plaintiff into Plaintiff's prior position. Ms. Rohr was in her early 30's and took over the majority of Plaintiff's job functions.

19

**Jeff Bank's Pattern and Practice of Discrimination against Older Employees**

77.    Jeff Bank, which employs approximately 130 employees, has terminated (fired or pushed out) more than six employees over the age of fifty-five (55) under questionable circumstances since approximately 2007.

78.    In or about 2007, Jeff Bank fired Charles Burnett, formerly the Chief Financial Officer, when he was approximately sixty-one years of age under questionable circumstances.

79.    In 2011, Jeff Bank fired Loreen Gebelien, a Vice President for Jeff Bank who was over fifty-five (55) years of age, under questionable circumstances. Jeff Bank asserted it discharged Ms. Gebelien for making a comment; however, it is questionable what this comment was or when it was allegedly made because it was never released.

80.    Debra Foresbloom, a Branch Manager at Jeff Bank's Monticello location was transferred to the Loan Department before Jeff Bank terminated her in November 2011. At the time of her termination Ms. Foresbloom was approximately fifty-five (55) years of age.  Ms. Foresbloom had approximately 25 years of banking experience and was allegedly fired for "accuracy," meaning errors; however, it is questionable if she made any errors that would reasonably be considered excessive.

81.    Kerry Jo Nebsedowski was a Branch Manager of Jeff Bank and, upon information and belief, Jeff Bank forced her into retirement because of her age. Ms. Nebsedowski had

been employed by Jeff Bank for approximately nine years and was approximately fifty-five (55) years of age when terminated.

82.   Ruth Brustman was a Branch Manager for Jeff Bank of whom Wayne Zanetti said he "did not like letting her go." Ms. Brustman had been with Bank of America and other bank for 30-40 years before joining Jeff Bank and had been with Jeff Bank for only three or four years before she either was forced to resign or was fired in 2012 because of her age. She was approximately sixty-five (65) years of age.

83.   An employee of Jeff Bank with initials of "E.D." was a Senior Teller who was approximately 50 years old, and, upon information and belief, Jeff Bank either fired this person or forced this person to resign under questionable circumstances after it terminated Plaintiff. This employee had worked for Jeff Bank for more than five years and was approximately fifty-five (55) years of age when terminated.

## FIRST CAUSE OF ACTION AGAINST JEFF BANK
### (UNLAWFUL DISCRIMINATION, HOSTILE WORK ENVIRONMENT AND RETALIATION IN VIOLATION OF ADEA)

84.   Plaintiff realleges and incorporates herein by this reference each and every allegation contained in the above paragraphs herein.

85.   As described above, Defendant Jeff Bank has taken adverse employment actions against Plaintiff, subjected him to a hostile work environment and/or maintained an atmosphere of adverse actions, due to his age, and/or his opposition to discriminatory practices, in

violation of the Age Discrimination in Employment Act of 1967, 21 U.S.C. § 621, *et seq.*

86. By reason of Defendant's discriminatory actions against Plaintiff, Plaintiff has suffered a loss of earnings including past and future salary and benefits, full pension benefits, and other company sponsored benefits and great pain, mental anguish and mental and physical injury, justifying an award, *inter alia*, of back pay, front pay, benefits, compensatory and liquidated damages, attorneys' fees, equitable relief, and any other damages and/or remedies permissible under law.

## SECOND CAUSE OF ACTION AGAINST JEFF BANK AND SANBORN
(Violation of the New York Human Rights Law)

87. Plaintiff realleges and incorporates herein by this reference each and every allegation contained in the above paragraphs herein.

88. As described above, Defendants Jeff Bank and Sanborn have taken adverse employment actions against Plaintiff, subjected him to a hostile work environment and/or maintained an atmosphere of adverse actions, due to his age, and/or his opposition to discriminatory practices, in violation of the New York Human Rights, N.Y. Exec. Law § 296, *et seq.*

89. By reason of Defendants' discriminatory actions against Plaintiff, Plaintiff has suffered a loss of earnings and benefits, future earnings and benefits, great pain, mental anguish and physical injury.  Plaintiff is thus entitled to all forms of applicable compensatory damages, equitable relief, and any other damages and/or remedies permissible under law.

## THIRD CAUSE OF ACTION AGAINST JEFF BANK AND SANBORN
### (Retaliation under the New York Human Rights Law)

90.  Plaintiff realleges and incorporates herein by this reference each and every allegation contained in the above paragraphs herein.

91.  The conduct of Defendants Jeff Bank and Sanborn in terminating Plaintiff's employment and retaliating against him by continuing to harass him after he complained to Jeff Bank's Human Resources Department of his unlawful treatment and ultimately terminating his employment constitutes unlawful retaliation against Plaintiff in violation of the New York Executive Law, §§290 *et seq.*, and specifically §296.

## FOURTH CAUSE OF ACTION AGAINST JEFF BANK
### (Violation of the Family Medical Leave Act)

92.  Plaintiff realleges and incorporates herein by this reference each and every allegation contained in the above paragraphs herein.

93.  Plaintiff alleges that Defendant Jeff Bank's unlawful termination of his employment violates the laws of the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq.*, justifying an award, *inter alia,* of back pay, interest, liquidated damages, and any and all other damages he is entitled to under law against Defendant.

94.  Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff demands judgment against all Defendants according to the proofs at trial of compensatory, emotional, physical, liquidated and punitive damages (where

applicable), lost pay, front pay, pre-judgment interest, attorneys' fees, injunctive relief, and any other damages permitted by law.  Plaintiff also demands judgment against defendants for each cause action and for all applicable and permissible damages, upon the proofs in an amount to be assessed at the time of trial. Plaintiff further seeks injunctive relief, including but not limited to, the clearing of his personnel file of any wrongful disciplinary actions, immediate reinstatement, and a permanent injunction enjoining all Defendants and their agents from any further actions abridging Plaintiff's rights. Plaintiff further demands all attorneys' fees, disbursements and other costs and all further relief, equitable or otherwise, to which Plaintiff is entitled and/or which the court deems just and proper.

Dated: May 23, 2013

By: _____
Karen L. Zdanis (KZ3651)
ZDANIS LAW FIRM, PLLC
Old Turnpike Road, Suite 304
Nanuet, New York 10954
(854) 356-0855


Michael D. Steger, Esq. (MS2009)
STEGER KRANE LLP
30 Ramland Road, Suite 201
Orangeburg, NY  10962
(845) 359-4600

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Ronald Lewis<br>186 Dilon Road<br>Monticello, NY 12701 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2012-04969 | Holly M. Woodyard,<br>Investigator | (212) 336-3643 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
| ☐ | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| ☐ | The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☒ | Other (briefly state)   **Charging Party wishes to pursue matter in Federal District Court.** |

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed <u>WITHIN 90 DAYS</u>** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

_____          April 19, 2013

| Enclosures(s) | Kevin J. Berry,<br>District Director | (Date Mailed) |
|---|---|---|

cc:

| JEFF BANK<br>Attn:  President<br>4866 State Route 52<br>Jeffersonville, NY 12748 | Karen L. Zdanis, Esq.<br>55 Old Turnpike Road, Suite 304<br>Nanuet, NY  10954 |
|---|---|

**EXHIBIT A**